UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**LORETTA DWIGHT**,                          Case No. 3:11 CV 1769

        Plaintiff,                        Magistrate Judge James R. Knepp, II

    v.                                         MEMORANDUM OPINION AND ORDER

**MARITZ RESEARCH,**

        Defendant.

### INTRODUCTION

Plaintiff Loretta Dwight brought an action against her employer Defendant Maritz Research alleging race, gender, and/or age discrimination pursuant to Ohio Revised Code § 4112.01, et seq., and "all applicable Ohio and statutory common law."

The Court has jurisdiction under 28 U.S.C. § 1332. The parties have consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). Plaintiff specifically alleges three instances of discrimination:

1. Defendant gave two white male co-workers, Rob Miller (Miller) and Jim Minning (Minning), opportunities to work in Phases III and IV of certain IT projects, while Plaintiff was denied such opportunities and forced to work only in Phases I and II, based on her race, age, and/or gender;

2. Defendant transferred her from the company's Nissan North American (Nissan NA) team to the company's Canadian team because of her race, age, and/or gender, while younger white male co-workers were not transferred; and

3. Defendant promoted white male co-workers, Chris Boyd (Boyd) and Frank Laughlin (Laughlin), to Developer Analyst II positions but denied Plaintiff such a promotion, forcing her to remain a Developer Analyst I, based on her race, gender and/or age.

(Doc. 9).

Defendant filed a Motion for Summary Judgment (Doc. 23) with Exhibits (Docs. 23-1, 23-2, 23-3, and 23-4). Plaintiff did not file a response. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment.

## BACKGROUND

Defendant operates a marketing research company in Maumee, Ohio, where Plaintiff is currently employed within the company's IT department. (Doc. 23-1, Tr. 1). Plaintiff reports to manager of IT Kimberly M. Michalak (Michalak), a 45 year old white female. (Doc. 23-1, Tr. 1). Michalak reports to Division Vice-President and Director of IT Diane L. Thober (Thober), a 52 year old white female. (Doc. 23-1, Tr. 1). Employees in the IT department are assigned to different client projects, including projects for automobile manufacturers such as Nissan, Ford, Mazda, Kia, Hyundai, Chrysler, General Motors, and Toyota. (Doc. 23-1, Tr. 1). Within this structure, project teams are led by IT Team Leads (leaders for particular projects) and Business Unit Leaders (leaders responsible for client relationship). (Doc. 23-1, Tr. 1; Doc. 23-2, Pl's Dep. 36-37).

Plaintiff began working for Defendant as a Programmer Analyst around September 20, 1993. (Doc. 23-1, Tr. 1). On or about August 16, 2002, Plaintiff was promoted to Programmer Analyst II. (Doc. 23-1, Tr. 1). She held this position until November 16, 2002, when her job title changed from Programmer Analyst II to Analyst IT (II). (Doc. 23-1, Tr. 1). Plaintiff remained in this position until April 2, 2009, when Defendant again changed Plaintiff's title from Analyst IT (II) to Developer Analyst I, following a company reorganization to more closely reflect job titles assigned to individuals in the IT industry who perform similar job duties. (Doc. 23-1, Tr. 1-2). Plaintiff was employed as Developer Analyst I when she initiated this action and remains employed by Defendant in that position. (Doc. 23-1, Tr. 2).

2

Plaintiff's Assignment to Phase I and II

IT employees are assigned work on one or several of Phases when working on a project: Phase I is mail out; Phase II is processing; Phase III is scoring; and Phase IV is web programming. (Doc. 23-1, Tr. 2). Employees are assigned to work in a certain Phase based on their skill sets, as each Phase requires experience and training in specific technology. (Doc. 23-1, Tr. 2). Plaintiff was assigned to Phases I and II because she did not have the hands on web programming skills required for Phases III and IV. (Doc. 23-1, Tr. 2; Doc. 23-2, Pl.'s Dep. 53). Plaintiff's co-workers Minning and Miller, however, did have educational backgrounds and work experience related to the skills required for Phases III and IV. (Doc. 23-1, Tr. 2-6). Therefore, Minning and Miller were assigned positions to complete Phases III and IV tasks – Developer Analyst II – and Plaintiff was not. (Doc. 23-1, Tr. 2-6; Doc. 9, at 6; Doc. 23-2, Pl.'s Dep. 37).

Plaintiff's Transfer From the Nissan Team

In 2007, Dennis Norman (Norman) became the Business Unit Leader for the Nissan NA account. (Doc. 23-1, Tr. 6). Between fall 2007 through early 2009, Nissan NA expressed increasing dissatisfaction with Defendant's work. (Doc. 23-1, Tr. 6). Specifically, Nissan NA complained client deliverables were frequently both inaccurate and late. (Doc. 23-1, Tr. 6). In response to Nissan NA's concerns, Norman conducted an assessment of the Nissan NA team. (Doc. 23-1, Tr. 7). Norman reviewed Defendant's approach to operations and also the team's structure and skill set. (Doc. 23-1, Tr. 7). Norman determined that personnel changes were necessary if Defendant hoped to renew its contract with Nissan NA. (Doc. 23-1, Tr. 7; Doc. 23-2, Pl.'s Dep. 39). One such personnel change involved Plaintiff's removal from the Nissan NA team. (Doc. 23-1, Tr. 7). Thober, Vice President and Director of IT, decided transferring Plaintiff to the Nissan Canadian team was the best solution.

(Doc. 23-1, Tr. 7). Several other employees were also removed from the Nissan NA team, including Kim Dulbs (46 year old white female) and Debra Jo Fortney (55 year old white female). (Doc. 23-1, Tr. 7). Plaintiff's transfer to the Nissan Canadian team did not result in a decrease in title, benefits, pay, or job duties. (Doc. 23-1, Tr. 7-8; Doc. 23-2, Pl.'s Dep. 132).

Plaintiff's Job Title Change to "Developer Analyst I"

Effective April 2, 2009, Defendant changed Plaintiff's job title from Analyst IT (II) to Developer Analyst I, following a market analysis of the company's IT function and reorganization of the IT department to more closely reflect the job titles assigned to individuals in the industry who perform similar job duties. (Doc. 23-1, Tr. 8). This was a change in title only, with no associated reduction in pay. (Doc. 23-1, Tr. 8). Prior to the 2009 market analysis, Defendant employed Plaintiff's co-workers Chris Boyd (Boyd), age 34, and Frank Laughlin (Laughlin), age 52, as Analyst IIs. (Doc. 23-1, Tr. 8). After the market analysis, Defendant reclassified Boyd and Laughlin as Developer Analyst IIs. (Doc. 23-1, Tr. 8). Defendant based this decision on Boyd and Laughlin's skills, experience, and abilities, including their ability to work in performing design and debugging functions, and their client-facing work. (Doc. 23-1, Tr. 8). Boyd and Laughlin, like Plaintiff, experienced only a change in job title to accurately reflect their job duties within the IT community. (Doc. 23-1, Tr. 8).

The job duties of a Developer Analyst I are more limited and routine than those of a Developer Analyst II. The Developer Analyst II position involves going beyond the planned scope of a project and requires frequent client interaction. (Doc. 23-1, Tr. 8; Doc. 23-2, Pl.'s Dep. 40-44). The Developer Analyst I position involves working with established processes and does not involve significant client interaction. (Doc. 23-1, Tr. 8). There are also differences in the qualifications

required for both positions. (Doc. 23-1, Tr. 10). The Developer Analyst II position requires several skills not required for the Developer Analyst I position, including experience in financial services, 3-5 years experience in a technology-related field, including software development, ability to comprehend the business process of clients' culture, and ability to follow project issues and have a multi-area perspective on issues and planning. (Doc. 23-1, Tr. 10). Essentially, the Developer Analyst II position requires more advanced experience with web programming and technology. (Doc. 23-1, Tr. 8). According to Thober, both Boyd and Laughlin were qualified to perform Developer Analyst II tasks, and had been performing those tasks since February 2009. (Doc. 23-1, Tr. 10). Plaintiff, however, both before and after the market analysis, performed tasks related to the Developer Analyst I position, such as maintaining existing protocols under the supervision of teams leads and senior developers. (Doc. 23-1, Tr. 11-12; Doc. 23-2, Pl.'s Dep. 41-44). Neither Plaintiff's pay or job duties were affected by the reclassification. (Doc. 23-2, Pl.'s Dep. 107).

Plaintiff remains an employee of Defendant to date. (Doc. 23-2, Pl.'s Dep. 133). During her 20 years of employment with Defendant, Plaintiff has not experienced any racial epithets, ageist or sexist remarks, or derogatory comments on the basis of her race, age, or gender. (Doc. 23-2, Pl.'s Dep. 31-32, 72). Indeed, Plaintiff testified she liked working for Defendant, enjoyed her job, and liked the people she worked with. (Doc. 23-2, Pl.'s Dep. 133). She also believes her annual performance evaluations have been accurate and fair. (Doc. 23-2, Pl.'s Dep. 145).

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the Court must draw all inferences

from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The fact that the motion for summary judgment is unopposed does not relieve the Court of the task of determining whether a material factual dispute exists. *U.S. v. Crooksville Coal Co., Inc*., 560 F.Supp. 141, 142 (S.D. Ohio 1982) (*citing Smith v. Hudson*, 600 F. 2d 60 (6th Cir. 1979)) (quotations omitted).

## ANALYSIS

Plaintiff alleges race, gender, and age discrimination under state law – specifically, Ohio Rev. Code § 4112. It is well accepted the standards for these claims under federal and state law are identical. *Carter v. Univ. of Toledo*, 349 F. 3d 269, 272 (6th Cir. 2003); *Genaro v. Cent. Transp., Inc*. 84 Ohio St.3d 293, 296-98 (1999).

To establish a disparate treatment discrimination claim, a plaintiff may employ one of two methods: the direct case, or the circumstantial indirect case. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). "Direct evidence is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least the motivating factor in the employer's actions.'" *Davidson v. Franciscan Health Sys. of the Ohio Valley, Inc*. 82 F. Supp.2d 768, 771 (S.D. Ohio 2000) (quoting *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Here, Plaintiff has not alleged direct evidence, so she must establish a circumstantial

case of discrimination employing the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* (citing *Mauzy v. Kelly Servs., Inc.*, 76 Ohio St.3d 578, 582 (1996). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination.

To set forth prima facie case of discrimination under § 4112, Plaintiff must prove that: "(1) she is a member of a protected group; (2) she was subject to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside of the protected class." *Russell*, 537 F.3d at 604.

Once these elements are established, the burden shifts to the employer to articulate a nondiscriminatory reason for the discharge. *McDonnell Douglas*, 411 U.S. 792. If the employer does so, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's proffered reasons are pretextual. *McConaughy v. Boswell Oil Co.*, 711 N.E.2d 719, 725 (Ohio App. Ct. 1998) (quotations omitted); *see also Frantz v. Beechmont Pet Hosp.*, 690 N.E.2d 897 (Ohio App. Ct. 1996).

An adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hicks v. Concorde Career Coll.*, No. 10-5275, 2011 WL 6016245, at *2 (6th Cir. 2011). Here, Plaintiff has failed to show the conduct alleged was adverse to her employment status. To the contrary, the employment decisions (assignment to Phase I and II, transfer to Nissan Canada, and reclassification) did not impact her job duties, pay, salary, benefits, or otherwise have any adverse impact on her employment status at all.

Plaintiff testified she performed tasks related to her skill set in Phases I and II and she has

set forth no evidence her co-workers, Minning and Miller, were treated more favorably based on race, gender, or age by their assignment to Phases III and IV. Rather, the evidence shows they were performing job duties consistent with their education, qualifications, and skill sets in Phases III and IV, just as Plaintiff was performing tasks which correlated to her skill set and education in Phases I and II.

Furthermore, Plaintiff testified her transfer to Nissan Canada from Nissan NA resulted in no decrease in title, pay, or benefits. (Doc. 23-2, Pl.'s Dep. 131-32). The Sixth Circuit does not consider lateral transfers, without more, adverse employment actions. *Freeman v. Potter*, 200 F. App'x 114, 123 (6th Cir. 2006) ("In general, a lateral transfer . . . is not a materially adverse action."). Here, Plaintiff has not alleged "more", and she admitted she performed the same job duties, received the same pay, and maintained the same benefits after she was transferred. Therefore, this transfer was not adverse.

In addition, Plaintiff's reclassification from Analyst-IT (II) to Developer Analyst I did not result in an adverse change to the terms and conditions of her employment. Plaintiff testified she performed the same tasks and her pay stayed the same after her job title was changed. The same was true for Boyd and Laughlin. They were not assigned new duties or additional responsibilities. Rather, they, like Plaintiff, merely experienced a change to their job titles to more accurately reflect job titles used by other employers in the industry performing the same work.

Accordingly, because Plaintiff did not show she suffered an adverse employment action, she cannot establish a prima facie case of discrimination.

## CONCLUSION

Because no genuine issues of material fact exist on any of Plaintiff's claims, the Court grants Defendant's Motion for Summary Judgment. The case is dismissed.

IT IS SO ORDERED.

               s/James R. Knepp II
               United States Magistrate Judge